## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 27 2017, 10:13 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Hilary Bowe Ricks
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Christina D. Pace
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Adrian Vergara,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | June 27, 2017<br><br>Court of Appeals Case No.<br>49A04-1612-CR-2806<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Sheila Carlisle, Judge<br>The Honorable Stanley E. Kroh, Magistrate<br><br>Trial Court Cause No.<br>49G03-1602-F4-6348 |

**Bradford, Judge.**

# Case Summary

[1] On the morning February 13, 2016, Appellant-Defendant Adrian Vergara was working as a maintenance man for a residential apartment building when he entered one of the apartments to complete a requested repair. While in the apartment, Vergara came into contact with then-thirteen-year-old T.W., who lived in the apartment with her mother. T.W. was home alone at the time. Vergara engaged in a conversation with T.W. while he completed the requested repair. During this conversation, he told T.W. that she was very beautiful and requested hugs from T.W. When T.W. complied with his request for a hug, Vergara held on to her and kissed her with an open mouth and his tongue.

[2] Vergara was subsequently charged with two counts of Level 4 felony child molesting and Level 5 felony criminal confinement. He was found guilty as charged after a bench trial. At sentencing, the trial court vacated one of the Level 4 felony child molesting convictions and sentenced Vergara to an aggregate six-year term with three years executed and three years suspended to sex offender probation.

[3] On appeal, Vergara challenges the sufficiency of the evidence to sustain his conviction for Level 4 felony child molesting. We affirm.

# Facts and Procedural History

[4] In February of 2016, then-thirteen-year old T.W. lived with her mother in an old Victorian home in Indianapolis that had been converted into apartments.

Vergara, who was thirty-eight at the time, was employed as the "maintenance man" for the apartment building. Tr. p. 11. T.W. was familiar with Vergara as she had observed him completing maintenance in the building on prior occasions. At some point prior to February 13, 2016, T.W.'s mother put in a maintenance request after a shelf in T.W.'s closet broke. Upon receiving the maintenance request, Vergara informed T.W.'s mother that he would contact her before coming to make the repair.

[5] On the morning of February 13, 2016, T.W.'s mother awoke before T.W. and walked to a nearby Dollar General store to purchase some items for breakfast. When T.W.'s mother left the apartment, she locked the deadbolt on the front door.

[6] T.W. noticed that her mother was gone when she woke up and went to use the restroom. At the time, T.W. was wearing a "sports bra and green baggie sweat pants." Tr. p. 10. While T.W. was in the restroom, she heard a knock on the front door. T.W. yelled for the person at the door to "hold on" before realizing that the person had "let himself in." Tr. p. 11. When T.W. came out of the restroom, she saw Vergara "standing there." Tr. p. 11. Vergara indicated that he "was [there] to fix [the] closet." Tr. p. 11. T.W. believed that although she did not know that Vergara was scheduled to do maintenance work within the apartment on that morning, she "thought that [her mother] knew" so she "just went to [her] bedroom and sat on [her] bed while he was fixing the closet." Tr. p. 13. T.W. "was playing around on [her] phone" while making small talk with Vergara as he worked in the closet. Tr. p. 13.

[7] During her conversation with Vergara, T.W. indicated that people were bullying her. Vergara responded by repeatedly telling T.W. that she "was very beautiful." Tr. p. 14. Vergara asked T.W. how old she was and T.W. responded that she was thirteen.

[8] Vergara did not leave immediately after fixing the shelf in T.W.'s closet. Instead, he "stayed a couple minutes after" and "kept asking for hugs." Tr. p. 14. Vergara asked for hugs "more than once." Tr. p. 14. T.W. "really didn't know how to respond" to Vergara's requests. Tr. p. 14. Even though she did not want to hug Vergara, eventually T.W. gave Vergara "hugs because [she] didn't know how to respond and [she] felt awkward in the situation." Tr. p. 15. T.W. felt "awkward" hugging Vergara. T.W. was standing on her bed when she hugged Vergara, with her face "on his shoulder" and his arms "[a]round [her] waist." Tr. p. 15.

[9] The hug "ended normally," but Vergara "kept asking for hugs" and eventually began asking "for kisses." Tr. p. 16. Vergara asked for kisses "more than once." Tr. p. 16. T.W. felt that Vergara "shouldn't be asking me for kisses, because he knows how old I am." Tr. p. 16. T.W., who did not want to kiss Vergara or for him to kiss her, indicated that she "felt really uncomfortable and not safe." Tr. p. 16.

[10] "Still feeling uncomfortable," T.W. gave Vergara another hug. Tr. p. 17. When she tried to pull away, Vergara "continued to hold" T.W. and his "lips caught [her] lips." Tr. p. 17. T.W. later explained that "[w]hen I pulled away,

his lips caught my lips and he ended up kissing me and I tried to pull him away again, his arms were still wrapped around me so I really couldn't -- I, uh, panicked." Tr. p. 17. T.W. further explained that Vergara kissed her with an open mouth and that "it "felt like he was trying to shove his tongue down my throat." Tr. p. 18. Afterward, T.W. felt "[r]eally, really, uncomfortable and scared." Tr. p. 18. After kissing T.W., Vergara indicated that he should go and said that T.W.'s mother "would probably be mad." Tr. p. 19. He then left the apartment.

[11] After Vergara left the apartment, T.W. locked the deadbolt on the front door and "put a chair under the doorknob." Tr. p. 19. She then "panicked and ran into" the restroom and called her grandmother and a friend. Tr. p. 19. T.W. later recounted that while she was locked in the restroom,

> I heard a knock on the door and I didn't respond because I was still on the phone with my grandma, and I heard the door being unlocked and the chair moving and he was banging on the bathroom door, I was on the phone with my grandma and I was trying to tell her to be quiet because she was yelling into the phone, and I didn't want him to know I was there.

Tr. p. 20.

[12] At some point, T.W.'s mother returned home. T.W. listened as her mother entered the apartment and "made small talk" with Vergara. Tr. p. 21. T.W. "peeked [her] head out of the bathroom door." Tr. p. 21. T.W. was shaking and crying while she hysterically mouthed to her mother "to get [Vergara] out of the house." Tr. p. 21. When Vergara "peeked over and saw" T.W., she

"hurried and closed the bathroom door and locked it again and waited until he left." Tr. p. 21.

[13] T.W. exited the restroom after Vergara left the apartment and started to report Vergara's actions to her mother. Vergara re-entered the apartment while T.W. was talking to her mother. Vergara did not knock and had not been invited back in. When Vergara re-entered, T.W. "got very nervous, extremely nervous." Tr. p. 33. T.W.'s mother asked Vergara "what are you doing? I -- Sorry, but I have to get ready for work, you're going to have to leave." Tr. p. 33. After Vergara exited the apartment, T.W. told her mother what Vergara had done. T.W.'s mother became "extremely irate." Tr. p. 33. She ran out of the apartment "looking for" Vergara and found him standing in the back parking lot. T.W.'s mother then "ran straight upstairs and called the police." Tr. p. 34. Officers responded to the apartment and spoke to both T.W. and her mother. Vergara was arrested later that morning.

[14] On February 18, 2016, Appellee-Plaintiff the State of Indiana ("the State") charged Vergara with two counts of Level 4 felony child molesting and one count of Level 5 felony criminal confinement. The trial court conducted a bench trial on October 14, 2016, after which it found Vergara guilty as charged. The trial court subsequently vacated one of Vergara's convictions for Level 4 felony child molesting due to double jeopardy concerns. The trial court then sentenced Vergara to an aggregate term of six years for the remaining Level 4 felony child molesting and Level 5 felony criminal confinement convictions. In imposing this sentence, the trial court ordered that three years were to be

executed and three years suspended to sex offender probation.   This belated appeal follows.

# Discussion and Decision

Vergara contends that the evidence is insufficient to sustain his conviction for Level 4 felony child molesting.[1]  Specifically, Vergara argues that the evidence is insufficient to prove that he acted with the intent to arouse or sexually satisfy either himself or T.W.

> When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences supporting the verdict.  It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction.  To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it most favorably to the trial court's ruling. Appellate courts affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt.  It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence.  The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict.

*Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007) (citations, emphasis, and quotations omitted).  "In essence, we assess only whether the verdict could be

---

[1] Vergara does not challenge the sufficiency of the evidence to sustain his conviction for Level 5 felony criminal confinement on appeal.

reached based on reasonable inferences that may be drawn from the evidence presented." *Baker v. State*, 968 N.E.2d 227, 229 (Ind. 2012) (emphasis in original). Upon review, appellate courts do not reweigh the evidence or assess the credibility of the witnesses. *Stewart v. State*, 768 N.E.2d 433, 435 (Ind. 2002).

[16] Indiana Code section 35-42-4-3(b) provides that

> A person who, with a child under fourteen (14) years of age, performs or submits to any fondling or touching, of either the child or the older person, with intent to arouse or to satisfy the sexual desires of either the child or the older person, commits child molesting, a Level 4 felony.

"Mere touching alone is insufficient to constitute the crime of child molesting." *Bass v. State*, 947 N.E.2d 456, 460 (Ind. Ct. App. 2011) (citing *Nuerge v. State*, 677 N.E.2d 1043, 1048 (Ind. Ct. App. 1997), *trans. denied*).

> The State must also prove beyond a reasonable doubt that the act of touching was accompanied by the specific intent to arouse or satisfy sexual desires. [*Nuerge*, 677 N.E.2d at 1048]. The intent element of child molesting may be established by circumstantial evidence and may be inferred from the actor's conduct and the natural and usual sequence to which such conduct usually points. *Id*.

*Bass*, 947 N.E.2d at 460. Thus, in order to convict Vergara of Level 4 felony child molesting, the State was required to prove not only that Vergara performed or submitted to fondling or touching with T.W., a child under the

age of fourteen, but also that he did so with the intent to arouse or satisfy the sexual desires of either himself or T.W.

[17]     In challenging the sufficiency of the evidence to sustain his conviction for Level 4 felony child molesting, Vergara does not dispute that on the date in question, he performed or submitted to fondling or touching with T.W., a child under the age of fourteen. Vergara argues only that the evidence is insufficient to prove that he did so with the intent to arouse or to satisfy the sexual desires of either himself or T.W.

[18]     One may reasonably infer from the record that Vergara acted with the intent to arouse or satisfy the sexual desires of either himself or T.W. During trial, T.W. testified that Vergara told her that she was beautiful and repeatedly asked her for hugs and kisses before kissing her with an open mouth as she tried to pull away. T.W. further testified that Vergara attempted to use his tongue when kissing her and that it "felt like he was trying to shove his tongue down [her] throat." Tr. Vol. II, p. 18. We have previously concluded that the "natural and usual sequence associated with 'tongue kissing'" is sexual arousal. *See Davis v. State*, 956 N.E.2d 726, 730 n.3 (Ind. Ct. App. 2011) (citing *People v. Calusinski*, 733 N.E.2d 420, 426 (Ill. Ct. App. 2000) (providing that an open mouth tongue or "French" kiss is an inherently sexual act which generally results in sexual excitement and arousal, and, as such, one could reasonably infer that the defendant intentionally placed his tongue in the victim's mouth for purposes of his own sexual arousal); *Cornelius v. State*, 445 S.E.2d 800, 804 (Ga. Ct. App. 1994) (providing that the evidence that defendant "French" kissed the eleven-

year-old victim was sufficient to authorize the jury's finding that the defendant was guilty of child molestation with the intent to arouse his sexual desires)).

[19] The trial court found T.W.'s testimony regarding Vergara's actions to be credible. We will not second-guess this credibility determination on appeal. *See Stewart*, 768 N.E.2d at 435. As such, in light of T.W.'s testimony coupled with our previous decision in *Davis*, we conclude that the evidence is sufficient to prove that Vergara acted with the requisite intent, *i.e.*, the intent to arouse or satisfy the sexual desires of either himself or T.W. Vergara's claim to the contrary amounts to an invitation to reweigh the evidence, which we will not do. *Id*.

[20] The judgment of the trial court is affirmed.

Mathias, J., and Altice, J., concur.